Thank you, Your Honor, good afternoon. My name's Lisa Kort, and I'm DNRG, which is the committee here representing for technologies. I'd like to reserve five minutes. We'll go on, okay? Thank you very much. As far as you're no doubt aware, we're here in a somewhat complex legal posture, where you pretty much understand the court bringing us together and consolidating these cases. I'm happy to report that I think the path forward is much more clear and straightforward, so I'm gonna leave all this with me to be able to show you that path today. First, with respect to the arbitration agreements and the consequences of this court's decision, the Mahomet case, where this court already held that Looper's arbitration agreements are enforceable, the very same agreements that are in issue in O'Connor and in all of these other cases, were rejected, specifically, the incarcerability findings, the very same findings that the district court made in these cases. So that reason alone, we respect the fact that the class in the O'Connor case must be decertified. The main plaintiffs in O'Connor have not been allowed arbitration, so they're not adequate plaintiffs to represent the absent persons who are bound by the agreements, and many individuals aren't before the court, the absent class members are bound by the arbitration agreements, so they can't be part of the class. So that's very straightforward. I'm not sure if you can hear me all right. With regard to whether the main plaintiffs can represent, you're referring to those that are subject to arbitration, so arguably might not be part of the class at all. Is there a problem with the main plaintiffs representing those plaintiffs who did opt out and can remain in court and undergo arbitration, or for the part of the case which may not be destined for arbitration upon your choice? We need to figure, there are some kind of problems with their representative abilities with respect to individuals that did opt out of arbitration, including adequacy problems. And I think we need to look at some of the arguments we've made in this broad proposition of the first, suggesting that the decision that we made last year indicates that it will result in much greater stability. It indicates certification of the instruments in order that individuals who sign the arbitration agreements did not opt out can be part of the class if individuals are bound to arbitrate. At least that's what I think. At least it seemed, I thought I heard you say that that the main plaintiffs can't be adequate representatives for whoever is left in the class. No, because the arbitration, you're only resurrecting it, so it's probably less of an approach. We'll come back to that issue. I mean, I don't mean to say you don't have arguments there, but I mean, I actually write this really in-depth. Let me just clarify the clarifying question for you. So, with respect to the class of drivers who did not opt out, the district court denied you the responsibility to compel arbitration, and you feel that that order is in front of us, or that the answer is in front of us as well, isn't it? Yes. So, if we, you know, we'll hear arguments as to why there are other reasons why that order was correct, but if we said that the district court heard in denying the motion to compel it is against those who failed to opt out, is that partially everything, or what was the effect of doing that? You know, I think that would, if you can help me, others who, like Sonny Robbins, who arbitrated, I think that that would be another round of scrutiny in saying that those individuals are no longer partners with Class Anderson. We then believe the court should still decertify the class with respect to the remaining individuals who did not sign the arbitration reports. Another round. So. So, with respect to that, I mean, we have appeals in the 23F certifications, but we're not in a position to, or the district court, in the first instance, would decide whether those people who have opted out, either from a class or not, if we don't even have that information, is that correct, or I guess you have some arguments that if we were to reach that anyway? We do, Your Honor, and I would like to address this, because I think we know if the court decertifies the class because of the arbitration provisions, and or compels the absent persons arbitration, we already know that the plaintiff's going to be the exact same argument regarding commonality, typicality, predominance, and they're very important issues. So, I'm going to come back to that, and the arguments will be the same, because those people were part of the class that was certified, and therefore, the argument's going to be in the district court. The court's already ruled on this, so we think it's very important to get candidates from this court on those issues. So, do we even know how many, what the sizes of the opt-out? We don't, Your Honor. We know it's probably in the thousands, but we don't have an exact count of the number of opt-outs up to date. So, I am going to come back to that, because I think the class certification order presents very significant legal problems, even with respect to people who opted out of arbitration. On the arbitration question, the plaintiffs are not, in this court, arguing unconstitutability. They've abandoned those arguments. They've now come and forth with two new arguments. The first is an argument that was not raised until about a year after the briefing, and Conner was closed, but is now part of the South Carolina Court of Appeal. This is the argument predicated on a Georgia Supreme Court decision applying Georgia law, the Bigger Stamps case, and the argument is, while no federal court has ever exempted a law from this court or any other circuit or the Supreme Court, the argument is that the named plaintiffs here, before they are even certified as class representatives, by opting out themselves, individual people, and then filing a lawsuit that had automatically nullified hundreds of thousands of arbitration agreements between Hoover and other individuals before the court. I understand the argument, but I read Bigger Stamps more limited. I read it as saying, if it may have told the period by which notice could be given, but it did not resolve the question as to whether or not these competitive class representatives could somehow take action, then why follow the other members of the client? And under that reading, your Honor, it really gets the plaintiffs in the water because it's just a tolling issue. We already have American pipe tolling, and individuals, for example, if who are deemed not to be part of the class, if they have some argument, even if they're compelled arbitration, if they exempt them based on an individual basis, special notations of these would have been tolled under American pipe. So that part of the decision, I didn't see them to be really reliant. They're stinging for the fences. They're saying, you know, our two people, as individual people, when plaintiffs could opt out, they nullify these groups, needless to say, the Federal Arbitration Act, which exists to ensure the enforcement of arbitration contracts in a fair and equitable manner, would not tolerate that, or would due process Rule 23. So I think that's an easy argument to dispense on. The Georgia court did not talk about any of the federal issues. I don't, as far as I can tell from the record, those issues weren't even raised with the Georgia Supreme Court. The next argument is the argument that the National and Public Relations Act, according to the plaintiffs, makes the arbitration agreements unenforceable. We think this argument, again, is very easy to dispose of, because this court, in two general decisions, has already decided that in the time of Omadi v. Giddingfield's case, Judge Wadsworth wrote an opinion for a panel, that addressed this explicit issue, the issue being where there's a voluntary opt-out provision, where it's a choice for an individual, whether to sign on to an agreement of arbitration, or to opt out and be equipped to solve class actions, or just take class actions in court. And as the Labor Relations Act has gotten implicated in my own pilot, and the court found it easy to dismiss that argument quickly, because of the language, the plain language of the National Labor Relations Act, which was written at the NLRB, weighed in by that point. In between the, in the, John Omadi v. Brannan Act, I don't know if they outweighed it on this particular issue. And so, under Brannan Act, certainly, we're required to draw a distance of question to whatever deference might be due to the court's decision. No, Your Honor, because Brannan Act and the Brannan Act certs were the agency after a decision, for example, you know, renders a decision that might implicate Brannan Acts, but after Brannan Acts, in Orris' decision, where the court found a mandatory arbitration provision to implicate the NLRB, the court specifically endorsed John Omadi, you know, vote on it, and said. Orris' certs meant that you got a trio of those cases before the Supreme Court could be argued in October. And why wouldn't we just wait to hear what the Supreme Court has to say? And the court would do that because if the Supreme Court reverses in Orris, and you were starting to suggest that's what the court should do, and based on the United States brief and the sentence in Orris' case, it would be much more powerful. And this is very powerful. I was going to use powerful, but I don't know if it's too powerful. But it's definitely more powerful. Yeah, and so we think that would take care of the issue, but even if the court goes the other way, we still would prevail based on John Omadi and Orris. In Orris, and Professor, she's left this question. In Orris, the NLRB acted on this question. They had filed an advocacy brief in this court. The parties prepared 28 g letters pointing out that there was this unassigned decision, which had taken this next step, and they said, and we'll hear from the NLRB, I think it's a pretty interesting argument that a person makes a voluntary choice about whether to opt out of an arbitration agreement or go in with lots of action in court, that that's interfering with a course in their rights. And I think just in plain language, that was the issue that John Omadi found, and that also goes to the brand-next-issue inference because in both John Omadi and in the Orris decision, this court found that the language of the statute was set upon or set upon as far as the court needed to go, and no inference was even getting to play. And so I think here, there's no reason to defer to the NLRB. I mean, we've all been victims of the case, and I'll admit, but they're also here where they're not taking a position on the fundamental jurisdiction of a person for them, and footnote four of their brief, they're not taking a position on whether the universe gives no for individuals to thrive on a diverse platform because they're not taking a position as to whether they're employees. So we think that on brand-next and this court's decisions, this court's decisions are binding. They've never been questioned. The Orris came out after the non-assignment decision. The non-assignment decision, I think, it's due to the need to defer to it as part of their modified template. Another circuit overturned it and disagreed with it, and again, on upsetting landmines of the statute. So we believe, again, here, no circuit is found, and it's been, NLRA has been in existence for a long time. No circuit is ever found that the NLRA somehow flew into voluntary arbitration provisions. The other point on difference that I wanted to get to is it's glaring that in the NLRA's brief in this court, outstanding the fact that the United States filed a separate briefing in the Morris case. It made this very point, does not grapple with the interplay between federal arbitration and the statute that they don't interpret and have no expertise, or no special expertise. And the NLRA, and as the United States argues in its brief, which we submitted with the 28-J letter, in other courts in Cali, there's no need to defer, no basis for deferring to the federal courts. I thought they had taken the position, I'm seeing as Carol Coney gets there, but I thought they'd taken the position that since the NLRA was a more recent act that it seemed to have maintained a congressional intent to override the federal arbitration. They, I didn't really, if you discuss the NLRA and FAA in its actual brief argument, we're just interested of the rule about the mandatory rules that apply. So I went back and looked at it, they mentioned the FAA on page one and on page seven where they're talking about the background of their prior decisions on just the new decision. But on that point in their letter again, I think in a better view, there's no clear congressional command that says voluntary and non-fearful arbitration agreement is interference or coercion. I mean, the rules interfere with other words, interference, coercion, threats, the kind of words in the statute are related to non-disciplinary and non-voluntary choice, which was the language that the court found in John Mahoney, and this court in Muhammad found that the opt-out waivers were voluntary and non-proliferative. Did I ask you a question about the Rule 63D orders which were all seen before us? As I was reading through them, it seemed like the compulsive part of the orders had been terminated by the court's August 2016 order and that all that was left was a determination that the classes that had already been formed should continue. Is that correct? What's left of the 23D order? It's not quite correct, and I know it's a false decision. There's a lot of moving parts here, so I wanted to clarify that. And so, where we stand with the 23D orders are in the second order from December 2015. Your Honor, you were correct that on a point forward basis, so the court said that the order would no longer have an effect on who were going forward from August of 2016 in terms of it needing to follow the mandates of the order and that it couldn't use that agreement. But, over our years, the court said that anybody who had signed up to that point was not bound by the arbitration agreement. So, but who was having compelled to speak? And that is my question. It seemed like the district courts if they're terminated but not vacated, meaning they have written them, they don't reflect the fact that whenever it's offered, they can go forward with the class? Yeah, so it's a different argument with the remains. So there's no going forward because of that ruling. It's not a first amendment argument. It goes back to the federal arbitration agreement. So the court, we have an order that says we cannot use an agreement that crucifies UL and the agreements of this court. And, of course, it does here. No one needs it. So, all we're asking is very simple really. We just ask the court to vacate both orders. And the plaintiff has admitted they called these careful as they said they were basically paraphrasing. But that they were never necessary because the language that was in the original agreement has been upheld by this court. So we want to have that clarified and simplified to so far as saying that those orders are vacated and they have no effect. We don't restrict UL or have no barrier of the enforceability of. The only, just to clarify, the only effect of those orders is not requiring Uber to do anything. It's just protected classes that had already been formed by the district court. Right, not required. What has Uber become held to do under these orders? The 2013 order remains in effect. The court has not changed it conscriptively or interactively. So it right now requires the rewrite that was done in 2014. It scans that right now, the effect of that in terms of that order. If Uber went back to the prior version before the district court required additional disclosures under this writing, that would be continued. It would be abolished from that order. So that's why we request that that order be vacated. With respect to the 2015 order, the court, we agreed from the beginning that the 2015 arbitration agreement that was submitted after the class was certified would not have any effect on a class. We said that explicitly. So that's not the issue. The issue is that new people and individuals who signed the agreement, who weren't part of the class at the time, would now be selected in the class. And my colleague on the other side, at this point, is already arguing in this report that these new people weren't part of the class that was certified in 2015, who signed an agreement that's valid and based on the source decision, they're not bound by that, including the valid agreement. We think that is not an admissible order. So just one file goes to 3.7. I noted that the August 2016 order terminated all of the prior, prior 23D orders, but you're saying that's not the case with your 2013 order. That's correct, Your Honor, and it is. So I think on the arbitration and the issues leading up to the consequences of the valid arbitration agreements, I've covered rather a few requests that the court decertify the class because the arbitration agreements are valid and or compel the class members to sign the arbitration agreements and agree to them as arbitration. Probably both because the class is no longer defined as it stands, or there's potentially, we prefer the issue of arbitrability to the arbitrator. The particular issue of arbitration is because the arbitrator winds up saying that these claims aren't arbitrable. Your Honor. Well, as we're approving total claims, obviously, Your Honor, and different arbitrators will consider different arguments and unique facts relating to the individual. Since based on this court's ruling, which I think arbitrators will find very disruptive in their decision on the agreement where the court dealt more directly with the substance, but then we'd have individualized antecedents or individualized issues as to enforceability. So, my one is there cannot be a class that includes these individuals who are found by the arbitration agreement or the class, but there's a specific case if the arbitrator is to sign, there are cases where we already have the body of the position that it's due for arbitration. Why can't there be a class of whatever's left? Well, first, sir, there is no pocket claim in this case. So, again, in the O'Connor case, even if that's, it's never been added and Judge Chen has never granted the motion to add one. But on the arbitration issues, the plaintiffs aren't in a position to take any action with respect to the people who are barred by the arbitration agreement and the individual arbitration groups. I mean, arguments, in fact, specific arguments as to individuals, but there won't be a possibility of a class-wide determination outside of the class action doctrine's input when someone else is spreading a class-backed controversy. And I don't want to take too much time on this because it's more theoretical than real, but it will be individual determinations with regard to arbitrability based on the facts of each case. But if there is a set of cases that the arbitrators determined are not arbitrable, I'm not sure what's the overriding reason that class treatment wouldn't be appropriate or wouldn't at least be sought for another person to do it. Well, the bad group, those individuals might then have the ability that would be totally, that would have been in place to take actions themselves, to band together, take actions based on whatever happens to them. But as to this case, they can't be protested, and as you say, they can't emerge. I wonder why. Well, I'll go back. The first plaintiff's conceded that a number of times that this cuts the class into an arbitration. The other response to enforceable. They haven't come up with any explanations as to why it couldn't go forward. But there are the class action mechanism is to have slowly situated individuals who are authorized to go forward together in court. If some individuals, hundreds of thousands of them, are repelled by an arbitration agreement that requires that in arbitration, then they are not, similar to the situation, there are thousands that have been kicked out of arbitration. It seems to me that whoever's left in that group together, whether that may be a question for a winner in the U.S. might be a little bit. Exactly. I do think that's a question for other day. Let me turn to the 23 of issues with respect to the World 23 standards because this is very important. This case, what we have is thousands of wildly discreditable people, a thousand, consistently thousands, who in a trial, we would have a 13 factor Borrello test, which this court applied a version of under the Restatement of Agency and there's recent shows, yes. That test is very, kind of specific. The California Supreme Court has said that each of the factors cannot be applied mechanically, except for tests that are entwined and their weight depends on particular accommodations. And the question is going to be in trying whether you can make an determination on a stroke that every one of these individuals is either an employee or even a contractor, that's a beyond possible. And in the district, what the district court did in its approach was it, we pointed out all sorts of different variations of the contracts and the court went through completely in efforts to say those differences didn't really matter. We think balance be clear. But the result of that was, the court found that there was a uniform policy in the company and that policy was to give drivers to administrative flexibility. So the court said, it's not as if there's no control over driver schedules or the hours they work or when they drive or if there's no supervision, there's no control over whether they can use the competing apps that say you're either using Uber. And so the court said that the uniformity is freedom in individuality. In a way, it's a lot like the huge versus small car case where it was first the managers and especially the balance of policy and the Supreme Court said, a policy of discretion is the opposite of a common question before a class action. That's what we have here in substance of first, it's the computer employees. We can say they're independent contractors who have the freedom to invest in a relationship using the Uber platform in any way they want and there's a huge variation. They might grow their relationship with Uber but they can't grow their relationship with the person they're driving around. And that they can negotiate or try to negotiate with Uber is still a thing yet but Uber sets the charge to the person who's driving and Uber defines it. The tip issue, for example, whether some portion of the value which could be given over by the passenger can be given over by the passenger. The contracts to give the driver the ability to alter the payment of the main point orders that they can't scale for several relationships with passengers, that's one point. One of the factors is the distinct business factor. The record is filled with declarations and proof that many individuals use the Uber app. This is one mechanism to get leads and to get passengers. Some of them are professional drivers, they use Lyft, they use some new sidecar, they use Uber, they have their own clients, they try, they give their car business cards out to the individuals that they meet when they're using the Uber app or some other app and so they have the freedom to craft their own. This is the distinct part. The other way that that was an important factor, the distinct business factor on the legal area of the court meeting was that the court said that the resolve that the court was requesting excluding from the class, those signed up on Uber and some of the agreement was a corporate name. But then there's all these other people, sole providers. We have a gentleman, Richard McKinsey, his declaration is that he owns and operates a three-distance car transportation. He's a class member, he has some business, he uses Uber as one of the exceeding clients. You know, I forgot to quote that subject, maybe I'll make two more points and save you for a bottle. The other point for the court to make as a significant dealer is on the question of the intent of the parties. So the Varelo in this court's decision in June talks about one factor for determining whether the individuals under the pentagon are as welcome as the rest of the other party, bought, what they believe, and what they intended. It's the sub-factor. How the blue said, this is the least significant factor and it's to tell the least wage. The Varelo decision itself literally says this factor is significant and it is a significant factor in this court applied it in the Jones case if we're talking about what is, all these factors really go to the question of what's the relationship between this individual here, if you take a name, like there's a girl's name called Pamuka, and you have to look at the fact that the bottom line is, is this person an employee? We have some people who use the internet once a week. We have a medical practitioner who is a full-time acupuncturist. He also uses this for an application. Is he in the same position as someone who says, I'm gonna use this app all the time, this is gonna be my own business? They're completely different. And so those individualized issues permeate the case. And I'll just wrap up and say, there was no trial plan here, no expert, there's probably mismatch between the creativity claim, pliability claim, and the actual damages claim. There was no damages methodology. The DC Freight decision, the court said, no methodology, no damages methodology, no class, there was none here. And so we believe they're also responsible for class certification beyond the arbitration issue. We request that the court look at those issues and decertify them outside of those grounds as well. Thank you. Thank you. Thank you. May I please record, good afternoon, I'm Shannon Luskier, and before the plaintiff, excuse me, I'm Nicole Carlson. I'm going to be ceding 20 minutes of my time to the National Labor Relations Court. Your Honors, there are significant issues before you in these appeals that have not ever actually been grappled with by the district courts, though we had argued them and preserved them, they were not actually addressed. I would submit that these courts strongly consider remanding these issues towards the court. I'm the plaintiff of Penal Solicitory, and this is at least the second or third time you've looked at this thing. Your Honors, you are saying it's the first time I've been before you. Yes. That was the second time you've been before me. Well, that was the status of it. So let me just explain the Baker Staff case. We've argued, we've argued, we've argued together. I asked the district court to consider it. He said, well, aren't you out of appeal? Oh, I did ask. I want you to consider sending it back to me since it wasn't decided there, but you decided, because you asked us for permission to brief it so that we could resolve it. Because this is exactly the concern I expressed to you at the status conference. This is a game of ping pong that we seem to be engaged in here. You asked for permission to brief the Baker Staff issues. He gave you leave to do that. Now you're saying you don't want us to decide the issue that you asked for supplemental briefing on. Well, I understand what you're, I think I understand what your strategy is, but you're really making a mockery of the appellate process. Okay, well, let me argue Baker Staff. The point was that when I tried to bring it to the district court, he said, you need to pass it to the appeals board even if I can't decide it. So, let me just make the argument. I won't. Did you tell us that in your writing that you're saying that you've already briefed it? I believe that I did. You believe that you did? I believe that I did. I did. At least at the status conference. Yes. At least when you said yes, argued, argued, yes. Yes. Okay, so your honors, as explained on page 13 of our brief, note 12, this issue was preserved from the very beginning. The whole debate that's taken over in this case over whether the arbitration clause is enforceable or not, that would be said from the very beginning that we were only addressing that issue on independence of caution because the state plaintiffs opted out. Now, the Baker Staff decision, it was a Georgia Supreme Court decision applying Georgia law while looking to the federal rule 23, U.S. Supreme Court denying cert on the decision. As far as we can tell, there is no court that has recanted it. They're raising the Baker Staff in order to oversight any, and it's a logical argument that class representatives act on behalf of a class, and the tolling issue that I have explained, if you read the Baker Staff decision, is that the lead plaintiff can opt out of arbitration if ultimately the lead plaintiff is certified as a class representative. That tolls the time for class members to themselves opt out of arbitration, and the way that that occurs is that upon class certification, class members are given the opportunity to opt out of the clause. If they want to be bound by arbitration, they can simply opt out of the clause, but otherwise, they conceded to the representatives to act on their behalf. This argument. Yes, the endowment of the CalPERS decision in 2017, which seems to limit American might to its specific theories, even after the Baker Staff opinion. Since Baker Staff relies on American might, effectively, for its argument or its theory, that seems to be undercut by CalPERS. What fashion to deal with that? I'm sorry, Your Honor, I'm not familiar. I believe that the, I think in the U.S. Supreme Court this last year, did not assert, I think the theory says that the issue was not whether a lead plaintiff by filing a suit for a punitive class commences the action, which is what American Might said. We said American Might's tolling argument was a totally equitable decision by the court, and so it was equitable tolling. In the interest of justice, that was how they featured Rice, American Might, but they said, we're not going to do that for a statute of repose, because we think Congress would not have wanted us to undertake any tolling. And so, in this case, then, to exempt Baker Staff, says that filing a lawsuit tolls the time for other punitive class members to opt out, and that seems to be undercut by the CalPERS analysis. Well, again, I would say that the tolling, the way that the Baker Staff Court looked at it in saying that, effectively, the lead plaintiff had tolled the statute of limitations is one way to look at it. Another way to look at it is that a lead plaintiff takes the action that our rules recognize most people are not going to take. And so, I would submit that this Court should consider, and it's an argument that's not been researched into, because frankly, it just really hasn't been made, asides from where it seems that the Baker Staff case. So, the model argument that the class representatives have to make is the power to take actions on behalf, and before class certification, is the power to take action for lots of other people. Well, that's exactly what a plaintiff does when a plaintiff takes a class consultation, and if I can just move to a related area. I'm not sure that the wrong statement is true. You file a class action before certification, you can't say, okay, we're settling all these claims, period. I mean, the Court has authority far beyond what you're suggesting is the role for the Court here. I think the reason there hasn't been authority rejecting this argument is that the argument is more than a model. Well, I do think that it supports the purposes of a class action, and when a plaintiff files a case, obviously, a class doesn't get certified on day one and take some time in the litigation for it to be determined whether they've met their requirements, but if I could move to a related point, I'm jumping at an NLRA argument. We do have the argument, as well, that the plaintiffs themselves, who did opt out of arbitration, have a right to occasion concerted activity with a 99.whatever percent of the class did not opt out of arbitration. They had an independent right, and we only did make that argument. I mean, they had a right to occasion concerted activity with one of Hooper's arguments is that the lead plaintiffs had opted out of arbitration unless it could represent a class of people who hadn't, but that overlooks the point that the lead plaintiffs have their own NLRA rights to occasion concerted activity with their coworkers. In the event we offer it to the district court that they could amend in a plaintiff who had not opted out, the court, apparently, did not believe that was necessary, but if that was any cause of concern for this court, that could be allowed on a remand. Hooper cites the Ophelia's proposition that we didn't do that. That's an unpublished decision that predated the Morris decision. So, on the issue of jumping out at the NLRA argument, which the court is going to argue primarily, I do want to point out, in response to one of the questions that was asked of Hooper's argument that, where I believe it was said that the House Circuit has adopted this argument that opting out would not save an arbitrary class of people's legality, in fact, if you look at the Seventh Circuit decision in Lewis, it effectively did say this. On page 21, in our brief, it discusses the class waiver essentially being a per se violation that actually can't be legalized by assuming of no coercion. And, if you look at the Morris decision, in this case, although there was this statement in Dicta and a flip note, noting Donna McCarty, the decision's actually contradictory on this point because the decision describes how an employer can violate the NLRA a second time by requiring a class waiver, meaning that the first violation is precluding the concerted activity of the class action, and the second violation is requiring the class waiver, meaning that an opt-out clause, as a matter of fact, is not strictly mandatory or coercive. It doesn't matter to the fact that there is an NLRA violation that's under the Ninth Circuit's Coerced Decision. In conclusion to the argument that an opt-out provision can never be enforceable in the face of a challenge, it's impeding the concerted act study under the National Labor Relations Act. Well, I believe the court takes the position that an opt-out provision, whatever form it takes, never states the possibility of legality under the NLRA. We have an NLRA now from the Federal Arbitration Act. Is that the logical extension of that position? Well, I'm going to defer to the court to make the argument that the NLRA precludes employees from being denied the opportunity to engage in concerted activity, and that the mere fact that they had an opportunity to opt-out does not seem as, when I'm saying, we also have here on the record, it seems. The same thing as a non, that is saying that under no circumstances could an opt-out provision in a employment agreement, no matter how free and voluntary and knowing it was, be enforceable in the face of a challenge in an NLRA such as that, Jim. Well, yes, that is the board's position, and in this case, we have evidence in the records. It wasn't that it wasn't freely. In the language in the Congressional Act, that tells me that there's a new exception carved out of the preference for arbitration under the FAA. I would submit that because the act itself is too explicit on this point, that's the very reason why it's addressed to the board. We're just asking you guys one last action, we're not talking about the arbitration provisions holding it non-separable, that they wouldn't go together, is that right? We are talking about the cross-option waiver that is placed for the agreement that since it's separable, or if the board found it was separable, then what would happen if the legalization waiver was not enforceable instead? There could be arbitration of a class, is that correct? I believe, under recent hindsight, circuit authority, that it's possible. I'm a little concerned about how that squares with the Supreme Court's decision, Stolt-Nelson, but I do recognize that recent decisions of this court, including Morris, suggest that it could, in fact, be separable. I want to put, let's see, I want to move to, in the interest of time, while I do also want to point out that when I began by saying that there are issues here that perhaps should be remanded, another one is, there is the fact that the district court did not decide this opt-out issue, even though I preserve Henry as the ancillary issue because the court ruled on different grounds. He didn't have an occasion to grapple with this, so the court didn't consider remanding in light of that. Also, of course, because the Supreme Court is about to decide Morris, along with the other two cases, if you agree with us on Baker's staff, you wouldn't need to even address the enforceability of the opt-out question right now. What would be the purpose of asking the district court to oplate on an issue that you have now briefly presented to us and which we're prepared to rule on? What's the district court gonna add to the equation here that we don't already have before us? If you have it before you, I'm just noting that the public courts often rely on issues flushed out and decided by district courts. It's a pure legal issue and you've raised it. I agree. I agree. Perhaps it's that, I just, I'm noting for you the option to decline to do what we want to do. That's all you're saying? That is all I'm saying, yes, yes. Okay, and another issue, though, that you might consider remanding to the district court because perhaps it's not been flushed out as much is we've taken the position, as have other courts that we've cited in our briefs, that for purposes of the NLRA analysis, the court should presume employee status and just as the board takes jurisdiction of cases where workers challenge their classification as independent contractors, the board essentially presumes that because they take jurisdiction of those cases, here, Hoover argues that the court can't even apply the NLRA because the thrivers would classify as independent contractors. I believe the court should presume, without any doubt, you would remand to the district court to make a preliminary threshold determination. Excuse me, what you're suggesting is to do what the arbitrator is gonna be tasked with deciding. Well, so specifically under, before you're talking about it, it's the delegation clause, which I believe jurisdiction is gonna do, but it's a rule, are you saying? It's to decide the question of independent contractor versus employee, and as far as I understand, appropriately, in Mohammed, we made the determination that the provision is not unconscionable, and therefore, it's enforceable, and for the arbitrator to decide. So I'm just inquiring, would this court presume the answer to the question that we're sending to the arbitrator to decide? I'll tell you exactly why, because first of all, we're not standing on the Mohammed grounds, we're not pressing unconscionability here. We're saying that under the NLRA, the arbitration clause is not enforceable. Under Morris, which is part of the majority in this circuit, so to compel individual arbitration of the question of whether a worker is the employee and has rights under the NLRA, would itself violate the NLRA and Morris, which binds this court. Is there a reason, in your view, that will lead to the Supreme Court to rule on those cases in this area? And if you wish to speak. Yes, yes, there is. The reason is because of the bigger staff argument, and you don't even need to address the enforceability of the arbitration clause. I disagree with your bigger staff argument. What's the answer to Judge O'Connor's question with regard to the Morris issue? Well, I agree that if you're going to address a Supreme Court's decision, it's going to be, obviously it's going to have an impact. Yeah, of course. You gotta wait for a Monday. Yes, if you're really proposing we rush you in a state of view, knowing that the Supreme Court's going to be speaking to the same issue, why won't you answer? Well, because should this court's pass the ends, we mean there are these other issues that are going to have to address, including the option of remission. But what I'm saying is, again, if we don't even need to get to the question about whether your arbitration clause is enforceable, then it makes no difference what the Supreme Court says. The fact doesn't strengthen the bigger staff argument. So, if we haven't been persuaded by the bigger staff argument, we're right back where we started from, and we haven't gotten an answer from you as to whether there's reason for us to go forward first. Well, I don't know that would be the court's discretion if you don't agree with the bigger staff argument. Let me just note for you, before I run out of time, just a couple of practical points that I want to make sure the court is aware of. There was some questions about how big this clause might be. Should the arbitration clause be enforced if you reject the bigger staff argument? So, it's been corrected. I believe that it was actually only in the hundreds, several hundred drivers opted out in response to the enhanced notice provisions, or the original notice provisions, allowing them to opt out. The reason that should the arbitration clause be enforced, and those who have arbitration clauses excluded from the class, the reason that there would still be thousands of class members left is because there are thousands of people who drove for Uber prior to July 2013 when they first rolled out the arbitration clause. So, they're not bound by any arbitration clause. Uber has asked you to go to decertify this class. I would submit it's not for this court to certify the class should you conclude that the arbitration clause excludes the people who have arbitration grounds. If you were part of the class, the proper remedy would be to bring the end to the district court and let it be a decision that the district court could determine. Once a revised O.W.B. or O.L. for a briefing on the question is spent, Uber wants you to contain your order and then decertify this class. So, that's not the proper remedy. I wanna make sure you're listening to what we're talking about. I sort of refer to this class as the gray area. It's the drivers who signed up under the 2013-2014 agreements and before this panel issued its decision in the most ominous, the district court said they were gonna be bound by the rulings with respect to the class certification. So, if we settle that, if we vacate those orders, wouldn't the district court have to reconsider who actually is includable in this class? No, no, your honor. So, I'll touch briefly on the rules of 2013 orders which are completely included at this point. If you hold that drivers who are bound by arbitration clause can't be part of the class, that would leave only the people who were never even presented with an arbitration agreement because their work for Uber ended before Uber ever rolled one out in 2013 or the few hundred people who opted out. So, the orders that the district court issued, the 23D orders are completely moved at this point because in light of your Mahomet decision, it makes no difference what version of the arbitration clause they got. You're either going to agree with my Baker-Scheff argument, the agreement is unenforceable under the NLRA, or if not, there's no difference now between what it looked like in 2013, 2014, and 2015. So, as Judge Ikuda, I think, pointed out, there is nothing from those orders that's curbing Uber's rights on a going forward basis. They're all backward in time, and given that they're moved, there's no reason for an absolute court now to weigh in on whether or not they were rightly decided at the time. We submit that they were, but really what should happen is that those versions of the appeal should be dismissed and asked to be remanded for the court to decide what the impact of them is. Now, if Uber claims that it feels restrained in its speech with its employees, I'm sorry, with its drivers going forward because of those orders, Uber can do exactly what I did last night, which is ask the district court for permission regarding what it can do going forward, and then what the district court says it can do going forward can be determined in light of everything that has happened to date. But there's absolutely no reason for this court to weigh in with a hell of a decision regarding a mood issue, which both of those orders now are. You mentioned something that I don't understand, something you asked last night, what are we talking about here? Well, in light of yesterday, this panel denied my request for an emergency stay of a corrective notice order that the district court issued with respect to speech that I had, communications I had with the class members. Following that, I requested that the district court allow, I understand that that was a decision that was made for what's happened in the past, and that corrective notice, apparently based on this court's order, is going out this afternoon. I asked the court to allow me to engage in further communications, and that's under consideration now with the district court. I'm just saying by the same token, Uber can do the same thing. If it feels pretty strange now going forward, it can go back to the district court and ask for permission, but there's no reason for you now to weigh in on orders that were decided in the course of litigation that were unappealable case management orders, and since you can't unwind things at this point, who cares whether the drivers agreed to the 13 or the 2014 or 2015 agreement now has double legal, as you can see, more fight or no harm? Could I ask a question about the class? So I had to really focus on messenger. The class definition was drivers since August 16th, 2009, so you're saying that the period from August 16th, 2009 to 2013 when Uber circulated and the agreement was an arbitration clause, there were, those drivers were never asked to agree to arbitration, am I understanding that correctly? Yeah, yeah. More specifically, the drivers who stopped working for Uber before July 2013 when that was distributed, they were never presented with such a clause. So for us, any drivers who drove for Uber from August 2009 and then stopped before 2015, so for a van, do we know what the size of that class is? It's several thousand, and there were, as I said, I believe several hundred drivers who opted out of one or another version of Uber's arbitration clause. So I wanted to give my remaining time to the NLRB and I could just make two statements on the 23F appeal. I'll remind the court that the 23F petition was granted with respect to December's class certification order, not the September class certification order, so technically, what is before you is not whether or not the independent contractor status itself can be adjudicated on a class-wide basis. The district court sensibly noted that Uber has made a blanket determination as to whether its drivers, employees, or independent contractors, so it's law for it to say that that determination needs to be made on an individualized basis. The court, as we've noted, in Harrison's case, deferred most strongly to orders of class, anti-class certification rather than denying class certification, they were extremely thoroughly briefed, thoroughly argued, well-reasoned decisions according to the court's class certification orders and its commonplace court decisions to be decided on a class-wide basis in exactly the way that we have done it. The district court decided to address the one factor of Borrello that concerned and the separate business factor by splitting from the class those drivers who either drove through third-party companies, such as limo companies, or had their own corporate existence. The gentleman who Mr. Lynch was told about for a moment ago, I don't believe is in the class, if he had his own business, they were excluded from the class, so I'm going to arrest Schull for bribery, I believe he could not be deferred to the class because of the court's orders. And also keep in mind that even though the district court has low-wage workers, they often work for multiple companies at the same time, Uber has deepened the position that none of its drivers are prevented from driving for a lift, or a sidecar, that's a time when it's not unusual for low-wage workers to juggle multiple car-to-car jobs, so while they're driving for Uber, they can't get a customer to request from them in particular, or to hold them back, just like a McDonald's employee can't have a, an employer customer can't say, I want a cup of coffee, sir, for the next time. You're going to defer to the board. I am going to sit down and defer and ask the case to the board, thank you. Thank you, Your Honor, that's all I'm going to do. The people of the court, through the nation's liberty and justice department, we are only of the nation's court, not the nation's board, and those parties are unable to be objectively interviewed to contribute to the hearing. Your Honor, it's the court's position that the ongoing provision of the immigration and repatriation agreement does not rehabilitate, or would otherwise produce a rescission, or is being a lawful prospective waiver of LGBT sections and groups. It just may seem as though the court's position is that they are going to have an MECU, but under no circumstances are they lawful cocktail provisions. Well, that's correct, but I want to make sure my answer's limited to these are individual repatriation agreements, and in other areas, you know, in a plunge law or a waiver law, whether the opt-out provisions can come into play. I mean, I thought from your earlier question that maybe we're going to be expanding that into other areas, and for the purposes of this court today, it's the opt-out provisions, regardless of the terms, regardless of whether there is a requirement for a first opt-out, they are a lawful prospective waiver. I'm curious about the court's position, is that our retraction under the National Labor Relations Act is sort of the basis for resolving labor disputes in the workplace, and it seems to me that the General Counsel is now taking a position that is contrary to decades of practice under the National Labor Relations Act. I find that very concerning. Well, it might not surprise you, if you're in a disagreement, it's the arbitration is not the issue of the board, unlike many Supreme Court decisions that have been resolved in the last 30 years, the board is not challenged by the adequacy of arbitration for these obstetrician-drawing disputes. It's not the position, it's the arbitration, that's not the concern, or the board's concern, is the ability to intervene in the movement, employees to retain their rights, to either engage in or refrain from concerted activity at the time that there's a street arrest. Excuse me. We're only talking about the class-action waiver. Right now, there seems to be blurriness with the arbitration provision, because the class-action waiver here is in the arbitration provision, so the board would have no problem with having a arbitration provision, as long as employees could arbitrate as a class. Is that correct? Yes, Your Honor. The board, now, after a number of years of issuing decisions and cases such as this year, addressed a number of scenarios, and paths may come up, and you're correct. It deals in the ability to engage in relations to the list of factors. The board is acting from the fundamental proposition based on the Supreme Court case law, that both arbitration and judicial resolution of claims, they speak in conflict, and they start with opposition as a result. If employers agree to an inquiry, the Supreme Court provides for class arbitration, and can, in fact, argue for litigation on a cost-benefit basis, and the converse is true as well. The parties who have every ability, under the Supreme Court's decision to ensure that arbitration is given by a lateral, is given by a lateral proceeding, as long as they agree that employees should be able to engage in this sort of activity in conformity with the law, so it's a constant aspect. Okay, so the board's position today is that class action waivers are unenforceable for employees. Do I understand that correctly? There's nothing you could do to make that any agreement purporting to waive class actions, no matter how it's drafted, is void for employees. Do I understand that correctly? That is correct, but I would like to offer a complication. It is assuming that the agreement is prospective in nature, and when a dispute arises, an employee is here, the dispute is no more valid if there's an agreement reaching that point to arbitrate, as well on the prospective, as opposed to saying an agreement is no more valid. And we're back to the concern that I raised with you, that's exactly what we do when we enter a collective bargaining agreement. And so again, it provides a dispute resolution mechanism. Yes, Your Honor, and that's very different, because the- But that's a prospective waiver, as you know. Yes, Your Honor, and the Supreme Court has quietly and forcibly changed its position. It hasn't changed its position, Your Honor, that the ability of a labor organization to reach an agreement such as that is not so in the interests or science of such human rights. It's happening in place that they had a decision to select the exclusive representative. They made that, not only in 48-hour, they were being referred to practice charges in the long, slow proceedings that take place, but once an exclusive representative is found to be selected, they have their rights to the, protecting the rights such as said, to enter an agreement like that. Here, there's the absence of any action that's being taken in policy, and that's the distinction that's drawn. And so we can pay for it, Your Honor. At this point, they don't have a recognized bargaining representative, Your Honor. Well, that's right. That's right, and it's in their asset base. They're not prohibited, as I understand it, by Uber's contract from unionizing, are they? No, Your Honor. No, Your Honor. I'm sorry, Your Honor. I'm sorry, Your Honor. No, Your Honor. Oh, excuse me. So, I'm trying to harmonize here the congressional intent of the FAA with Congress's passage of the National Labor Relations Act. Yes, Your Honor. And the prominent role that arbitration plays in resolving disputes in the workplace. No, Your Honor, I think that some of the questions have been resolved in more, is the name explanation in more, as you think. Yes, Your Honor. What do you think of that? It's a reference to some determination in more as well. Yes, I do, Your Honor. Yes. I mean, it's very, very self-explanatory. In favor of your purge. In favor of your purge, Your Honor. Yes, okay, well, I just have a few responses. I think that we, the code number four, the board hasn't taken any issue about the jurisdiction of more to resolve this employee-independent contract. We're taking no issue. There's pending jurisdiction for the board. And so, because the board hasn't spoken on that, we're not taking a position on that. We're not taking a position on the determination clause that was once again, the board hasn't spoken to that issue. The last point I would make, I suppose, is that this board is obviously called first to the very next decision. And we believe that it was an assignment that came after Jim Mahomedy. And Jim Mahomedy did not squarely address the board's rationale for finding out that an agreement's not lawful in this scenario. And we question some of the same cases, but with a different rationality. And I think this is- Morris, you preceded on assignment, which is the argument of two counsels, maybe? No, Your Honor, I don't. I believe that Morris, the board, well, it's not that we seem to disagree, but the board acknowledges that there is other in circuit questions and tensions on this issue. However, there is a point, I'm afraid I'm going to say, Morris, the parties didn't brief, and there was a reference made to an assignment, I believe, in Florence. And it was briefed in that case, stating that some future need may be shown to deal with that. It's a law assignment. It's still a good court law. And all the counsels, my final point, I don't know if this will go well over, counsels made the point that the counselor never says something that is true. They did not use this complaint to make a national privilege to act as an advocate for citizenship, but rather, they made that a decision and also not hold it as a commitment. And so, it's not your decision. It's important, and I never feel that I'm simply, I didn't agree with the issue, and it hasn't been treated with right in the other court. Although, it has been argued in the fourth circuit, it is stated there, and it is stated in this court and other cases on the record of the country. Thank you. Thank you for your participation, Your Honor. I'll let your theory continue, Your Honor. Thank you. I'll just pick up right there. First, this was already suggested that the Lewis Court had resolved this issue or had addressed the bottom-down version of the, right, if this is to be correct, on page 1155, the court explicitly mentioned in a circuit journal, the lie decisions, and we have no need to resolve these differences because, in our case, it's understated that the dissent to the argument was a condition of employment, and with respect to Morris, the court was very clear. It didn't just reference the John Mulally decision as chairman of the Council of the Amendment of Dissent. It just said, it sort of touched on it and said that where there's an opt-out, this issue isn't raised, it's outlined, and it focused on the fact that it was a condition of employment. It was a required condition, and to go back to what you were asking about, with the class provision, the position that the court is in, there can't be class arbitration that then runs right into Concepcion. That was the whole thesis, so we generally call it a Concepcion Supreme Court. It said, class arbitration is fundamentally inconsistent with the characteristics of arbitration, so a rule like the board is proposing, just, a position is one of the Supreme Courts that can have FAA decisions like those, but they don't have the answer to that. So, I included 23F standards back, and I think Council's argument, it's clear, plaintiffs want to get back to the district court. The class, this is why I think it's important to reach these 123 questions. The class does include individuals who signed on originally when there was an arbitration agreement. Most of those people are going to be former drivers, very differently positioned when we're talking about all being, at this point, we're going to hear about it, it's probably not a classification issue that many drivers, a couple of us, but because if they signed up, if they stayed on the platform, they wouldn't stand the arbitration agreement, they'd have to be former drivers. She's right, she's divided by saying they have to have left at the 14th. Exactly, and they're very different positions, so that raises all kinds of issues, but Council's opinion is that the plaintiffs already asked to expand the class to include all those people who logged out in 2015 and this is why the 23Ds are set forth as important. They signed a completely valid agreement that had more notice provisions than the 2014 and 2013 agreements that this court upheld, and they're going to place it in a scenario that basically swept in because that was a 23D order renders their assent invalid and violates the FAA and is improper under the court's decisions. If I may just finish up with the rules, these issues have been a little bit over the top. Thank you. I'd mention this, I think that the fact that the errors and the pros of this report, it's not good, it's not a certification, should be reviewed by this court if these are some sort of complaint backup. Plaintiffs submitted no evidence to support classification, no declarations, no expert report, so six supplemental regulations in the separate news feed, no fairness in the record, no trial plan, nothing. We submitted hundreds of declarations, expert reports, we grappled with the evidence, and just the court took an approach that I just mentioned, and these are all fundamentally letters, said that freedom and flexibility in the individuals was a uniform policy that justified the classification as the feature that makes it impossible to say that every person who used the platform is either an independent contractor, or an employee all at once. The court, as I mentioned earlier, ignored the individualized police speech into the parties and misinterpreted, said the exact opposite of what Borrello said, that that is a significant factor that just the court found out it was filled out in a significant way, clear error. The court ignored the declarations we submitted, and it didn't take into account what these people were saying. Basically saying, well they don't know really at all, they're not lawyers. They said very little, and I urge the court to take a look at the bankruptcy declarations. These are not cookie cutter, they are detailed statements by individuals saying I want to be an independent contractor, I want this flexibility, they don't like this law, so there's an adequacy problem where you have to help them enforce certain institutions. It's bizarre that some of the ancient provisions, as I mentioned, this court's decision in Calhoun's Anonymous to support, went through an arduous analysis, a little evidence from Blandin, but this was before its analysis of the contracts, to keep these widely disparate determination provisions and harmonize them, and then to keep the court declared, well they're the same, they're not the same, but the fundamental equal error that the court had to think, he said that the unilateral determination of the driver and Uber, how to equi-determinate the contractor and the debasable, is the unsinkable from the indivisible, the unilateral running by the company. And therefore, there were no individualized issues. This part of Jones' case in Hawkins said that mutual determination only goes to the incumbency relationship in supporting independent contractor relationship, and there are other California courts which would again just legal error. I mentioned the distinct business issue, Mr. McKenzie, this part of the file, it's a sole proprietor, and that's the problem with the certification, it sort of sweeps in people who could not be part of the class, and it's been a problem since. Thank you very much. Thank you all. In case there's already a submitted, we will hold a follow-up review so that we can get your names out so that we can get it to be adopted. Bye-bye.
judges: Tallman, Clifton, Ikuta